******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

## MARTIN A. RADER, JR. *v.*
## PAUL J. VALERI ET AL.
## (AC 45407)

Bright, C. J., and Alvord and Clark, Js.

*Syllabus*

The plaintiff stakeholder, an attorney who represented the defendant V in a real estate transaction in which V sold two real properties to the defendant M Co., brought an action for interpleader to determine the rights of V and M Co. to funds held in escrow until V obtained certain zoning approvals for the properties. The properties, which were adjacent to each other, were located in a federal opportunity zone, which provided the opportunity for tax deferment. M Co. made clear its intent to V that it desired to continue mixed commercial and residential use for the first property and to convert the second property from a single-family residence to a two-family residence. Various zoning and use approvals were required from the city of Danbury in order to use the second property as a two-family property. In order to qualify for the tax benefits of the opportunity zone, V and M Co. were required to close on the transaction within a six month window. In order to ensure the closing could take place within the time frame needed to obtain the tax deferment, the parties entered into a contract for sale containing a rider to the contract that called for the creation of an escrow agreement to hold $75,000 of the purchase price contingent on the receipt of specified zoning and use approvals on or before February 1, 2020. M Co. designated V as its agent relative to any application for a variance for the second property. The zoning board granted the application for the variance for the second property with the stipulation that there would be no street access to the front of the second property, the driveway to the front of the second property would need to be removed and replaced with grass, and access to parking for the second property would be available only through an easement over the first property in favor of the second property. M Co. did not agree to the creation of the easement. After trial, the court rendered judgment awarding the escrow funds to M Co. On appeal to this court, V claimed that the trial court made erroneous factual findings and improperly concluded that he failed to satisfy the contingency set forth in the escrow agreement requiring that he obtain a use variance for the second property. *Held*:

1. M Co. could not prevail on its claim that V's appeal was moot because V did not challenge each independent basis for the trial court's judgment; if this court were to agree with V's claim that the trial court misconstrued the escrow agreement as a matter of law, there would be no other basis on which to affirm the trial court's judgment and this court could grant V practical relief by either directing judgment in his favor or by ordering a new trial.

2. V could not prevail on his claim that the trial court made clearly erroneous factual findings; even if this court assumed that the challenged findings were clearly erroneous, the trial court did not rely on either of those findings in reaching its conclusion that V failed to satisfy a condition of the escrow agreement and, thus, any alleged error was harmless.

3. The trial court properly concluded that V failed to satisfy a condition of the escrow agreement and awarded the escrow funds to M Co.: the contract for sale and the escrow agreement were connected by reference and subject matter and, when read together to determine the intent of V and M Co., were unambiguous that, although M Co. designated V as its agent to obtain a use variance for the second property, it did not grant V any authority that allowed him to encumber the first property in pursuit of a use variance for the second property; moreover, the use variance V obtained for the second property was conditioned on the granting of an easement over the first property, which did not satisfy the terms of the escrow agreement or the contract for sale, which expressly required that V convey the properties without private restrictive covenants or easements; furthermore, V's reliance on the fact that there was no dispute that the only access to the additional parking

spaces behind the second property was across the first property as support for his suggestion that M Co. knew that a permanent easement would be required for the use variance for the second property lacked probative force because, with M Co. as the owner of both properties, no easement would be required to allow such access.

Argued September 18, 2023—officially released January 9, 2024

*Procedural History*

Action for interpleader to determine the defendants' rights to certain funds held in escrow in connection with the sale of two real properties, brought to the Superior Court in the judicial district of Danbury, where the court, *Kowalski, J.*, granted the plaintiff's motion for an interlocutory judgment of interpleader and ordered the plaintiff to deposit the funds with the clerk of the court; thereafter, the case was tried to the court, *Shaban, J.*; judgment for the defendant MSPD Downs Street, LLC, from which the named defendant appealed to this court. *Affirmed.*

*Alexander Copp*, for the appellant (named defendant).

*Brandon B. Fontaine*, for the appellee (defendant MSPD Downs Street, LLC).

*Opinion*

BRIGHT, C. J. This interpleader action arises from a real estate transaction in which the defendant claimant, MSPD Downs Street, LLC (MSPD), purchased two properties located in Danbury from the defendant claimant, Paul J. Valeri.[1] The plaintiff stakeholder, Martin A. Rader, Jr., sought an order determining the rights of Valeri and MSPD to funds held in escrow until Valeri obtained certain zoning approvals for the properties.[2] Valeri appeals from the judgment of the trial court, rendered after a court trial, awarding MSPD the escrow funds and attorney's fees. On appeal, Valeri claims that the court (1) made clearly erroneous factual findings and (2) improperly concluded that he failed to satisfy one of the zoning contingencies set forth in the escrow agreement. We affirm the judgment of the trial court.

The following facts, either as found by the trial court or undisputed by the parties, and procedural history are relevant to Valeri's claims. "In 2019, MSPD sought to purchase from Valeri two properties located at 10 Downs Street [also referred to as 10 Downs] and 12 Downs Street [also referred to as 12 Downs] [in] Danbury . . . . The two properties are adjacent to each other. 12 Downs is a corner lot, also bordering Smith Street, with parking in the rear of the building that is accessed from Smith Street. On that lot is a large house with 2838 square feet of living area. . . . While zoned as a commercial property for offices, it also houses a residential apartment. . . . The adjacent property at 10 Downs is a small residential ranch home. . . . Unlike 12 Downs, its use is limited to a one-family residential property." (Citations omitted.) 10 Downs Street has a front driveway that leads to a garage, and there is a parking area behind the building. In order to access the parking area behind 10 Downs Street, vehicles must enter from Smith Street and travel across the parking area behind 12 Downs Street.

"Valeri marketed the properties as being in a federal opportunity zone. Such designated zones are an economic development tool that encourages investment in distressed communities by providing the opportunity for tax deferment. In expressing its interest in the propert[ies] to Valeri, MSPD made clear that it desired to continue the mixed commercial and residential use of 12 Downs but also to convert 10 Downs from a single-family residence to a two-family rental property. To qualify for the tax benefits under the requirements of the opportunity zone, the parties had to close on the transaction within a six month window.

"In order to ensure that the closing could timely take place to obtain the tax deferment benefit, the parties entered into a contract for sale of 10 Downs and 12 Downs that was fully executed on September 23, 2019. . . . That contract called for a purchase price of

$625,000. Nevertheless, knowing that a zoning variance and other approvals would be needed to meet the goals of MSPD as to the use of the properties, the parties added a rider to the contract [that] called for the creation of an escrow agreement to hold $75,000 of the purchase price in escrow contingent upon the receipt of specified zoning and use approvals from the city of Danbury on or before February 1, 2020.

"To this end, paragraph 14 of the contract specifically states: 'Seller [Valeri] due diligence through 9/27/19 [initialed] w/City of Danbury regards escrow contingencies. Escrow agreement to be finalized by attorneys: contingent upon [Valeri] delivering 2 family status for #10 Downs [and] zoning use letter confirming #12 Downs for [apartment] over professional offices, both by 1/31/20.' . . . The parties also added a rider to the contract that . . . states: 'Supplementing paragraph 14, the sum of $75,000 shall be held in escrow until the zoning and use contingencies are satisfied. Seller [Valeri] and Purchaser [MSPD] shall execute a mutually agreeable form of escrow agreement at closing.' . . .

"[A]t the time of the closing on October 2, 2019, the parties entered into an escrow agreement as called for by the contract. The relevant portion of that agreement states:

" '2. The Escrow Agent shall hold said funds until satisfaction of the following conditions: a. The Seller obtains a zoning use letter from the Zoning Enforcement Officer of the City of Danbury, CT to the effect that under current zoning regulations the property known as #12 Downs Street may be used for professional office and residential use with one residential unit over the professional office space, and

" 'b. The Seller obtains a Use Variance for the property known as #10 Downs Street, Danbury, CT which variance permits the use of the property for two residential units, with the addition of a second floor to the existing building to accommodate the second residential unit.

" 'Notwithstanding the above, Seller may alternatively satisfy the zoning conditions by obtaining a zone change to R-3 residential plus such variances from the [zoning board] as would be required to add a second residential unit over the existing building at #10 Downs Street and permit the use of #12 Downs Street for professional office space with one residential unit over the professional office space or three residential units.

" '3. In the event that the conditions set forth above are not met before February 1, 2020 (Termination Date), then in that event the Escrow Funds shall be returned to the Buyer.' . . .

"Hence, the escrow agreement set forth two [conditions] that needed to be met in order to release the $75,000 to Valeri as the seller and set a deadline of

February 1, 2020, for doing so. Because of his experience in the field of real estate as a broker for over forty years, MSPD agreed to designate Valeri as its agent relative to any application for a variance brought to the city of Danbury relative to 10 Downs. . . . There was no provision regarding any action by Valeri as MSPD's agent relative to 12 Downs.

"Following the execution of the contract and escrow agreement, the parties proceeded to close the transaction and Valeri commenced work on meeting the [conditions]. As to paragraph 2a of the agreement, Valeri obtained a letter from the zoning enforcement officer of the city of Danbury dated October 10, 2019, that confirmed that 12 Downs could continue to be used for professional office and residential use with one residential unit over the professional office space. . . . Therefore, that condition of the escrow agreement was timely met.

"As to paragraph 2b of the agreement, Valeri began his effort under the authority granted to him to act as agent for MSPD to obtain a use variance for 10 Downs. Although already addressed in paragraph 7 of the escrow agreement, the parties subsequently executed a separate agency designation dated October 8, 2019. That designation states: 'The undersigned owner of #10 Downs Street, Danbury, CT [MSPD] does hereby authorize Paul J. Valeri to act as its agent to pursue a use variance from the [Danbury zoning board of appeals (zoning board)], which variance would allow the addition of a second story to the existing building and the use of the two-story building as a two-family residence, and to do all things reasonably necessary to achieve that purpose.' . . . Like paragraph 7 of the escrow agreement, this designation also made no mention of any authority relative to 12 Downs.

"On or about October 21, 2019, Valeri submitted an application to the Danbury zoning board . . . for a use variance on 10 Downs consistent with the intent of the parties as expressed in the contract for sale and the escrow agreement. . . . After consideration by the zoning board . . . on or about December 12, 2019, the application was denied without prejudice to the submission of a new application. . . . Thereafter, Valeri submitted a new application dated December 13, 2019, which proposed eliminating the driveway in front of 10 Downs and obtaining an easement over 12 Downs to allow access to parking behind 10 Downs. . . . This was based on Valeri's belief from comments by the zoning board during the hearing that these conditions would be required for an approval. As part of the process, Valeri submitted a survey map dated December 18, 2019, entitled 'Proposed Parking Layout & Easement Map.' That map showed an easement over 12 Downs in favor of 10 Downs. . . . The application also included an unsigned Declaration of Easement which

Valeri indicated to the zoning board would be signed and recorded upon the granting of the variance. The second application was assigned for a hearing in January, 2020, but [it] was continued until February 13, 2020, due to the lack of a quorum.

"Prior to the hearing, Valeri contacted MSPD to make them aware of [his] belief that both the removal of the driveway from 10 Downs and an easement over 12 Downs would be needed to obtain the variance. There was communication between the parties and their counsel on the subject and MSPD expressly made clear that it would not support the plan to remove the driveway and grant an easement. In an email exchange between Attorney Rader representing Valeri and Attorney Michael Wood on behalf of MSPD, just hours before the February 13, 2020 hearing before the zoning board, Rader wrote in part: 'Word was passed to Paul [Valeri] last night that we will have to give up access to Downs Street forever to get variance. They will want to hear us agree to that tonight before they vote. I also believe [the zoning board] will want a commitment that [the] owner will sign and record [the] easement and map.' In response, Wood wrote, 'Marty, [I] will give you a call but Joe, Michele and Peter [i.e., MSPD] are not willing to unconditionally make these commitments tying up the parcels.' . . . MSPD's reasoning for this was that, if done, it would effectively create a situation that would merge the lots and prevent them from being sold separately thereby reducing the collective value of the two parcels. Even with that position, MSPD allowed Valeri to go forward with the February 13, 2020 hearing before the zoning board but reserved its right to claim that Valeri had failed to comply with the February 1, 2020 deadline for the granting of the use variance.

"At the hearing, Valeri pursued the variance application based on the plan of removing the driveway to 10 Downs and granting an easement over 12 Downs for the purpose of ingress and egress to 10 Downs. Following the hearing, the use variance for 10 Downs was granted based on those conditions. The relevant portion of the variance certificate issued by the zoning board . . . read[s] as follows: 'NATURE OF VARIANCE: GRANTED WITH STIPULATION: Use Variance, Sec. 5.A.2 to allow a two-family dwelling in a CG-20 Zoning District; Sec. 9.C.1.a. to change nonconforming, single-family dwelling into nonconforming, two-family dwelling; Sec. 9.C.2.b to extend or expand a nonconforming single-family dwelling to add second floor/second dwelling unit. The plan submitted, subject to the stipulation below, was entitled Proposed Parking Layout & Easement Map, No. 10 & No. 12 Downs Street, Danbury . . . . STIPULATION: The concrete area, formerly the driveway, will be eliminated and changed to grass, and there will be no entry onto Downs Street from 10 Downs Street.' . . . The variance was issued with the direction it be recorded on the land records.

"On March 12, 2020, following the expiration of the appeal period, Valeri provided the variance certificate to MSPD and asked that the $75,000 escrow be released to him. . . . In response, MSPD's counsel objected to the release of the escrow on the basis that '[t]he variance enclosed with your correspondence contains conditions and stipulations which are unacceptable to MSPD (and to which it notified Mr. Valeri it did not consent . . .). In addition, the variance was not obtained in a timely manner.' . . . Shortly thereafter, by email on March 16, 2020, on behalf of MSPD, Attorney Wood wrote to Attorney Rader relative to the conditional granting of the use variance and relayed that it was not acceptable to MSPD.

" 'I discussed with [Joseph Savino, a member of MSPD], your letter, and we respectfully disagree with both points. Joe was willing to allow the variance process to play out during February to see if [Valeri] would be able to deliver the approvals he repeatedly represented would be easily obtained. As you know, it became clear that there would be restrictions on not only 10 Downs but 12 Downs as well. The requirement for an easement will tie the two properties together in perpetuity, which was never contemplated or agreed [to] as part of the transaction. As for any representation [Valeri] may have made to the [zoning board], he had been expressly informed by his principal prior to appearing that we did not agree to the conditions, and therefore was not acting within the scope of his agency by purporting to agree to them. To the contrary, he appears to have been pursuing only his own self-interests. The conditions in the variance and the easement requirement were never agreed to or contemplated, and had they been at the time, MSPD would not have agreed to the purchase price it did. Notwithstanding the foregoing, MSPD is open [to] discussing a negotiated resolution of this matter if [Valeri] is. All of MSPD's rights, remedies and defenses are expressly reserved.' . . .

"Although having received the variance certificate, MSPD has not recorded it, and it therefore has yet to take effect. With respect to any encumbrances against the property, paragraph 16 of the contract states that the seller shall provide a warranty deed at closing that is 'free and clear of all encumbrances except . . . (ii) restrictive covenants and easements of record . . . .' It also states that '[t]he Property shall be conveyed free of any violations of any governmental rules, regulations or limitations or private restrictive covenants or easements.' . . . Valeri credibly testified at trial that the title search done prior to the sale of the property revealed that there were no easements or other encumbrances on the property. As such, at the time of closing, the purchase price of the properties paid by MSPD did not involve 12 Downs [Street] being subject to any easements subservient to 10 Downs [Street]." (Citations

omitted; emphasis omitted; footnotes omitted.)

Rader initiated the underlying interpleader action in May, 2020, and Valeri and MSPD filed competing statements of claim. Valeri claimed that he satisfied both conditions set forth in the escrow agreement, whereas MSPD claimed that the condition set forth in paragraph 2b of the escrow agreement had not been satisfied and that Valeri failed to satisfy both conditions before the February 1, 2020 deadline. After the court, *Kowalski, J.*, rendered an interlocutory judgment of interpleader; see footnote 2 of this opinion; the pleadings were closed, and the matter was tried to the court, *Shaban, J.*, on October 5, 2021. At trial, the court heard testimony from Valeri and his attorney, Rader, as well as from Savino, a member of MSPD, and MSPD's attorney. After trial, the court issued an order directing the parties to file posttrial briefs along with any claims for attorney's fees.

In his posttrial brief, Valeri claimed that he "fulfilled all of the conditions required in the escrow agreement . . . ." He argued that the contract for sale and the escrow agreement "do not contain a requirement that an easement or passway not be a condition for a use variance for 10 Downs Street. The language of the designation of agency authorized . . . Valeri to seek the variance doing all things reasonably necessary. The [contract for sale] and escrow agreement are . . . complete, thorough contracts. . . . There is a merger clause in the real estate contract at section 28 . . . . The presence of a merger clause in a written agreement establishes conclusive proof of the parties' intent to create a completely integrated contract and . . . any extrinsic evidence . . . should not be used to construe the contract." (Citations omitted.)

In its posttrial brief, MSPD claimed that the escrow agreement and contract for sale "are clear and unambiguous" and that Valeri "failed to comply with the clear terms and intentions of the parties' agreement . . . ." It argued that it "never consented to [the zoning board's] conditions in any contract it signed, nor were such conditions implied or remotely reasonable after the fact. . . . That is particularly true here [because] an easement would be contrary to what MSPD bargained for at paragraph 16 of the [contract for sale]—a property without any easements. . . . Valeri should not get the financial benefit of the sale at full market value and then immediately depreciate the property after the fact to meet [the escrow] conditions, purely to [MSPD's] detriments. MSPD has the same common ownership that Valeri did and does not want an easement. . . . Clearly, the easement and driveway removal would devalue the properties and decrease marketability by tying them together . . . ." (Internal quotation marks omitted.)

On March 14, 2022, the court rendered judgment for

MSPD, concluding that Valeri failed to satisfy the condition set forth in paragraph 2b of the escrow agreement requiring that he obtain a use variance for 10 Downs Street. In its memorandum of decision, the court reasoned that "Valeri was to obtain a variance to permit the use of the property for two residential units with the addition of a second floor to the existing building to accommodate the second residential unit. While receiving approval to do so, the approval was conditioned by the zoning board upon the grant of an easement over 12 Downs as well as the removal of the driveway from 10 Downs which was to then be covered with grass. These were conditions that were expressly not agreed to or authorized by MSPD after it became aware of the possibility [that] such conditions would either be sought by Valeri or imposed by the zoning board.

"While MSPD had designated Valeri as its agent to do what was 'reasonably necessary' to obtain the variance, the authorization to do so was limited to matters involving 10 Downs, not 12 Downs. . . . Even if 'reasonably necessary' was interpreted to mean that the pursuit of the use variance to obtain an easement over 12 Downs for access to 10 Downs, and removing the driveway from 10 Downs, MSPD had made clear when the topic was first broached on or about December 20, 2019, following the first hearing before the zoning board, that it was not agreeable to such conditions. . . . Again, immediately prior to the February 13, 2020 hearing, MSPD's counsel, upon being advised by Valeri's counsel [that] the zoning board would likely require an easement over 12 Downs and giving up direct access to 10 Downs, specifically set forth in writing that MSPD was '*not* willing to unconditionally make these commitments tying up the parcels.' . . . Valeri acted contrary to the express direction of his principal and credibly testified at trial that he never received authorization from MSPD to seek an easement or [to] agree to one, nor did he receive any authorization to agree to removal of the driveway . . . .

"The designation of Valeri as MSPD's agent to do what was reasonably necessary to obtain a use variance for [10] Downs could not entail pursuit of any easement over 12 Downs as to do so would put Valeri in direct conflict with the terms of the contract. Paragraph 16 of the contract made clear that the sale of the properties was to be clear of any 'private restrictive covenants or easements.' . . . To encumber the property with an easement, without the express consent of MSPD, would result in MSPD receiving something other than what it had bargained for at the time of the sale and purchase." (Citations omitted; emphasis in original.) This appeal followed.[3]

## I

Before addressing Valeri's claims, we first consider

MSPD's claim that Valeri's appeal is moot because he has failed to challenge each independent basis for the judgment. See, e.g., *Hartford* v. *CBV Parking Hartford, LLC*, 330 Conn. 200, 210, 192 A.3d 406 (2018) ("if there exists an unchallenged, independent ground to support a decision, an appeal from that decision would be moot, as this court could not afford practical relief even if the appellant were to prevail on the issue raised on appeal"); *Jacques* v. *Jacques*, 195 Conn. App. 59, 61–62, 223 A.3d 90 (2019) (same).

On appeal, Valeri claims that (1) the court made clearly erroneous findings as to the layout of 10 Downs Street and as to when MSPD first learned about the variance conditions imposed by the zoning board and (2) the court improperly concluded that he failed to satisfy paragraph 2b of the escrow agreement due to the variance conditions.

MSPD claims that the "court found that each of the two variance conditions—the easement over 12 Downs *and* the removal of the driveway at 10 Downs and covering with grass—were independently not authorized by MSPD, not 'reasonably necessary,' and not in compliance with paragraph 2b of the escrow agreement." (Emphasis in original.) Therefore, MSPD argues that "Valeri has not raised an adequate challenge to (1) the variance stipulation requiring removal of the front driveway from 10 Downs being noncompliant with paragraph 2b and (2) the court's factual finding that removal of each [of] the driveway and the easement were 'unreasonable.'" Valeri responds that the court did not find that the two conditions were unreasonable and that he has adequately challenged the court's interpretation of the escrow agreement, which was the basis for the court's decision. We agree with Valeri.

"Mootness is a question of justiciability that must be determined as a threshold matter because it implicates [this] court's subject matter jurisdiction . . . . [A]n actual controversy must exist not only at the time the appeal is taken, but also throughout the pendency of the appeal. . . . When, during the pendency of an appeal, events have occurred that preclude an appellate court from granting any practical relief through its disposition of the merits, a case has become moot. . . . In determining mootness, the dispositive question is whether a successful appeal would benefit the plaintiff or defendant in any way." (Citation omitted; internal quotation marks omitted.) *L. L.* v. *M. B.*, 216 Conn. App. 731, 736, 286 A.3d 489 (2022). Insofar as MSPD's claim requires that we construe the court's judgment, our review is plenary. See *Cunningham* v. *Cunningham*, 204 Conn. App. 366, 373, 254 A.3d 330 (2021) ("[b]ecause [t]he construction of a judgment is a question of law for the court . . . our review of the . . . claim is plenary" (internal quotation marks omitted)).

At the outset we note that the court did not, as MSPD

contends, expressly find that both conditions for the variance were unreasonable. Instead, the court held that Valeri's authorization to act as MSPD's agent to obtain the variance "was limited to matters involving 10 Downs Street" and that Valeri "acted contrary to the express direction of his principal [because] he never received authorization from MSPD to" agree to the variance conditions. The court also held that "[t]he designation of Valeri as MSPD's agent to do what was reasonably necessary to obtain a use variance for [10] Downs could not entail pursuit of any easement over 12 Downs" because "[t]o encumber the property with an easement, without the express consent of MSPD, would result in MSPD receiving something other than what it had bargained for at the time of the sale and purchase." Accordingly, there are three bases for the court's conclusion that Valeri failed to satisfy paragraph 2b of the escrow agreement: (1) Valeri exceeded his authority as to 10 Downs Street by agreeing to an easement over 12 Downs Street; (2) Valeri exceeded his authority by agreeing to the variance conditions to which MSPD objected; and (3) interpreting the agreement as allowing Valeri to encumber 12 Downs Street with an easement would contradict the express terms in the contract for sale requiring that 12 Downs Street be conveyed free of any encumbrances.

On appeal, Valeri claims that the court made clearly erroneous findings that justify a new trial and improperly concluded that he failed to satisfy paragraph 2b of the escrow agreement. He argues that "a variance with reasonable conditions is still a variance, and the variance [he] obtained . . . to allow a two-family house constituted a 'use variance' under the contract as a matter of law." If we agree with Valeri and conclude that the court misconstrued the escrow agreement as a matter of law, there would be no other basis on which to affirm the court's judgment, and we could grant Valeri practical relief by either directing judgment in his favor or ordering a new trial. Accordingly, his appeal is not moot. See, e.g., *L. L.* v. *M. B.*, supra, 216 Conn. App. 737 (appeal not moot if "successful appeal would benefit [the appellant]").

II

On appeal, Valeri challenges two of the court's factual findings. First, he claims that the court's finding that "10 Downs has a front driveway that leads to a garage in the back with a number of parking spots in the rear" is clearly erroneous, as "[t]he only vehicular access to the back parking lot behind 10 Downs Street is through the back parking lot behind 12 Downs Street." Second, he claims that the court's finding that the conditions imposed by the zoning board were "first broached on or about December 20, 2019," is clearly erroneous because "the topic of driveway removal was broached on December 6, 2019, at the latest, while the topic of the

easement was broached on December 13, 2019, at the latest." According to Valeri, "the trial court believed that the back parking area of 10 Downs Street could be accessed by vehicle over the unused, front driveway of 10 Downs Street, rather than solely through the back parking area of 12 Downs Street. As a result, the trial court failed to appreciate that the easement over 12 Downs Street was necessary to ensure access to adequate parking over 10 Downs Street. Especially when coupled with its factual errors concerning the timing of Mr. Valeri's notice of the required conditions to MSPD, taken as a whole, the erroneous factual findings justify a new trial."

For its part, MSPD concedes that the driveway for 10 Downs Street "does not lead to the parking spots in the rear" but notes that "[t]hat fact was never in dispute . . . ." MSPD claims that "the court's phrasing can only be fairly construed as a clerical error or misstatement that was not an erroneous factual finding" and, in the alternative, that any error as to the layout of the properties is harmless. Likewise, MSPD contends that any alleged error as to the precise date when Valeri first notified MSPD about the zoning board's conditions for the variance is harmless because, "[u]nder either scenario, MSPD learned of the variance conditions a few months *after* it purchased the property . . . ." (Emphasis in original.) We conclude that the challenged findings did not affect the court's conclusion and, consequently, that the alleged errors are harmless.

It is well established that "[a]ppellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Tilsen* v. *Benson*, 347 Conn. 758, 796–97, 299 A.3d 1096 (2023). "[W]here . . . some of the facts found [by the trial court] are clearly erroneous and others are supported by the evidence, we must examine the clearly erroneous findings to see whether they were harmless, not only in isolation, but also taken as a whole. . . . If, when taken as a whole, they undermine appellate confidence in the court's [fact-finding] process, a new hearing is required." (Internal quotation marks omitted.) *Autry* v. *Hosey*, 200 Conn. App. 795, 801, 239 A.3d 381 (2020). In a civil case, "[t]he harmless error standard . . . is whether the improper ruling would likely affect the result." (Internal quotation marks omitted.) *JPMorgan Chase Bank, National Assn.* v. *Lakner*, 347 Conn. 476, 496, 298 A.3d 249 (2023).

As an initial matter, we are not persuaded that the court's inaccurate description of 10 Downs Street indicates a fundamental misunderstanding of the layout of

the properties. Indeed, as noted by MSPD, there was no dispute that the parking area behind 12 Downs Street provided the only vehicular access to the parking area located behind 10 Downs Street. Valeri testified that "everybody understood. You know, you can't get a car from behind 10 [Downs Street] out to Smith Street with a helicopter. You've got to get there legally." Similarly, Savino, when asked if vehicles must drive across 12 Downs Street to access the parking behind 10 Downs Street, testified: "That's correct." MSPD, however, maintained that it could accommodate the necessary parking spaces without recording an easement, just as Valeri had used the properties while he owned them.

Nevertheless, assuming arguendo that the challenged findings as to the layout of the properties and the timing of MSPD's awareness of the additional conditions for the variance are clearly erroneous, such errors are harmless because the court did not rely on either of those facts in reaching its conclusion that Valeri failed to satisfy paragraph 2b of the escrow agreement. Instead, as previously discussed in part I of this opinion, the court concluded that Valeri exceeded his authority as MSPD's agent by agreeing to conditions to which MSPD objected and that Valeri's authority under the escrow agreement could not entail encumbering 12 Downs Street. Notwithstanding Valeri's claim that the court's "erroneous factual findings justify a new trial," he appears to agree that the court did not rely on those findings in reaching its ultimate conclusion, as he states in his reply brief that the court's decision "is clear: MSPD's unilateral agency designation conclusively established its right to the subject funds, regardless of whether . . . Valeri obtained the required 'use variance' as that term is used in the contract, and regardless of whether the two conditions were 'reasonably necessary.' " Consequently, because the court did not rely on the challenged findings in rendering judgment for MSPD, we conclude that any alleged error is harmless. See, e.g., *C. D.* v. *C. D.*, 218 Conn. App. 818, 828 n.6, 293 A.3d 86 (2023) ("[a]ssuming arguendo that [court's] finding is clearly erroneous, the error is harmless").

III

Valeri next claims that the court improperly concluded that he failed to satisfy paragraph 2b of the escrow agreement. Valeri argues that, "[r]ather than focusing on the key issue before it, i.e., whether the term 'use variance' as used in the escrow agreement includes variances with reasonable conditions, the trial court relied almost exclusively on the agency designation which was not even part of the underlying contract. . . . When properly focused on the language of the escrow agreement itself, it becomes clear that the term 'use variance' necessarily includes reasonable conditions imposed by a zoning board." MSPD responds that the use variance Valeri obtained for 10 Downs Street

"was not consistent with the parties' agreement in that it imposed unacceptable conditions upon MSPD outside the express terms of the contract, to which MSPD never agreed . . . or authorized." We agree with MSPD.

We begin our analysis with the applicable standard of review and relevant legal principles regarding contract interpretation. "When a party asserts a claim that challenges the trial court's construction of a contract, we must first ascertain whether the relevant language in the agreement is ambiguous. . . . When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact . . . . [When] there is definitive contract language, [however] the determination of what the parties intended by their contractual commitments is a question of law. . . . It is implicit in this rule that the determination as to whether contractual language is plain and unambiguous is itself a question of law subject to plenary review. . . .

"We accord the language employed in the contract a rational construction based on its common, natural and ordinary meaning and usage as applied to the subject matter of the contract. . . . Where the language is unambiguous, we must give the contract effect according to its terms. . . . A contract is unambiguous when its language is clear and conveys a definite and precise intent. . . . The court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity. . . . Moreover, the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . In contrast, a contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself. . . . [A]ny ambiguity in a contract must emanate from the language used by the parties. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Citations omitted; internal quotation marks omitted.) *C & H Shoreline, LLC* v. *Rubino*, 203 Conn. App. 351, 356–57, 248 A.3d 77 (2021).

When multiple "agreements . . . are connected by reference and subject matter, [they] are to be considered [together] in determining the real intent of the parties. . . . Where . . . the signatories execute a contract which refers to another instrument in such a manner as to establish that they intended to make the terms and conditions of that other instrument a part of their understanding, the two may be interpreted together as the agreement of the parties. . . . Contracts must be given a reasonable interpretation and the words used their common, natural, and ordinary meaning and usage . . . unless a technical or special

meaning is clearly intended." (Citations omitted; internal quotation marks omitted.) *Meeker* v. *Mahon*, 167 Conn. App. 627, 634, 143 A.3d 1193 (2016).

In the present case, although neither party claims that the escrow agreement is ambiguous, they disagree as to the applicable standard of review. Valeri contends that our review of the court's decision is plenary because the court relied on the language of the parties' agreements only, whereas MSPD claims that "this issue presents primarily questions of fact about the parties' intent and reasonableness, which are subject to the clearly erroneous standard [of review]." We conclude that Valeri's interpretation of the agreement is unreasonable and that the escrow agreement, when read together with the contract for sale, is unambiguous as to whether he satisfied paragraph 2b. Accordingly, because the parties' intent is "clear and certain from the language of the contract itself," our review is plenary.[4] *C & H Shoreline, LLC* v. *Rubino*, supra, 203 Conn. App. 357.

Paragraph 14 of the parties' contract for sale, titled "Additional Terms and/or seller concessions," as well as paragraph 34 of the rider to the contract, expressly reference the escrow agreement and related zoning contingencies.[5] Paragraph 2b of the escrow agreement requires that Valeri obtain "a [u]se [v]ariance for the property known as #10 Downs Street, Danbury, CT which variance permits the use of the property for two residential units, with the addition of a second floor to the existing building to accommodate the second residential unit." Paragraph 7 of the escrow agreement provides that "[MSPD] agrees to cooperate fully with [Valeri] in satisfying the zoning conditions set forth herein. In the event [Valeri] has not filed his application for variance for #10 Downs as of the conveyance of title, [MSPD] agrees that [Valeri] may file [the use variance] application for [MSPD] as the [a]gent of [MSPD]." Several days after the closing, MSPD, as the owner of 10 Downs Street, executed a separate agency designation authorizing "Valeri to act as its agent to pursue a use variance from the [zoning board], which variance would allow the addition of a second story to the existing building and the use of the [two-story] building as a [two-family] residence, and to do all things reasonably necessary to achieve that purpose." No similar agency designation was executed for 12 Downs Street.

As Valeri emphasizes throughout his brief, he obtained a use variance that permits the use of the property for two residential units, with the addition of a second floor to the existing building to accommodate the second residential unit. He argues that "the term 'use variance' plainly includes within its definition a variance with reasonable conditions or stipulations" and that "not only were the [conditions] reasonable, they were *necessary* when interpreted in light of the

situation of the parties and the circumstances connected with the transaction." (Emphasis in original.) Although we agree with Valeri that the term "use variance" reasonably could be interpreted to include reasonable conditions imposed by a zoning board on the use of 10 Downs Street, we are not persuaded that the agreement reasonably can be interpreted to allow him to encumber 12 Downs Street in pursuit of a use variance for 10 Downs Street.

At the outset we note that the contract for sale and the escrow agreement are connected by reference and subject matter and, therefore, must be read together in determining the intent of the parties. See *Meeker* v. *Mahon*, supra, 167 Conn. App. 634. Although Valeri claims on appeal that the parties' agency relationship was governed by the escrow agreement alone and that the court improperly relied on MSPD's agency designation, the only discernible difference between the agency designation in the escrow agreement and the later one executed by MSPD is that MSPD's later designation authorized Valeri "to do all things reasonably necessary to" obtain the use variance, whereas the escrow agreement did not include that phrase. Significantly, neither the escrow agreement nor MSPD's agency designation grant Valeri authority as to 12 Downs Street. Thus, whether reading the escrow agreement alone or together with MSPD's agency designation, we agree with the trial court that Valeri's authorization to pursue the use variance was limited to 10 Downs Street.

Likewise, we agree with the court that the variance condition requiring an easement over 12 Downs Street would directly conflict with paragraph 16 of the contract for sale, which required that Valeri convey the properties without "private restrictive covenants or easements." The fact that paragraph 16 also provides that, "[i]n the event [Valeri] cannot deliver the [properties] to [MSPD] at [c]losing, free of violations as aforesaid, [MSPD] may . . . terminate this [c]ontract because of such violations," demonstrates the significance of the clear title requirement. Indeed, it has been observed that "an easement of any kind, is an [e]ncumbrance, because it is a load or weight on the land, *and must lessen its value*." (Emphasis added; internal quotation marks omitted.) *Storrs* v. *Pannone*, 113 Conn. 328, 332, 155 A. 234 (1931).

Valeri, however, argues that his alleged lack of authority to bind 12 Downs Street is irrelevant to the analysis because "the [v]ariance does not bind the owner of 12 Downs Street to anything. Rather, it merely grants 10 Downs Street a variance on the condition that it *obtain* an easement from 12 Downs Street; it does not order 12 Downs Street to grant one." (Emphasis in original.) Similarly, he contends that there is no conflict between the escrow agreement and the contract for sale because (1) "the properties *were* conveyed without

private restrictive covenants or easements at the closing on October 2, 2019," and (2) paragraph 16 of the contract for sale "is mere boilerplate language unrelated to the variance in particular. As a separately added and negotiated term, paragraph 2b of the escrow agreement prevails. See 2 Restatement (Second), Contracts § 203, p. 93 (1981) ('(c) specific terms and exact terms are given greater weight than general language; (d) separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated')." (Emphasis in original.) In his view, "[t]here is no limitation on what [he] could do to obtain the variance, and MSPD could not unilaterally impose such a limitation (without breach), nor unilaterally decide what was 'reasonably necessary' to obtain the variance." Valeri maintains that the conditions imposed by the zoning board were not only "reasonable, they [also] were *necessary* when interpreted in light of the situation of the parties and the circumstances connected with the transaction." (Emphasis in original.)

Valeri's arguments are premised on an unreasonable interpretation of the parties' agreement, in that it would lead to the absurd result that he could, *as MSPD's agent in regard to 10 Downs Street,* agree to one or more conditions that would devalue 12 Downs Street, such that the variance would be worthless to MSPD, simply to secure for himself the $75,000 held in escrow. It is well established that courts "will not construe a contract's language in such a way that it would lead to an absurd result." *Welch* v. *Stonybrook Gardens Cooperative, Inc.,* 158 Conn. App. 185, 198, 118 A.3d 675, cert. denied, 318 Conn. 905, 122 A.3d 634 (2015). In arguing that he was required only to "obtain" the variance and whether MSPD chose to use it is irrelevant to the analysis, Valeri ignores the clear and unambiguous language of the contracts viewed as a whole. The same is true as to his argument that he delivered 12 Downs Street unencumbered at the time of the closing as required by the contract for sale. In other words, he reads each requirement in isolation and ignores the context of the transaction, in which MSPD purchased unencumbered properties from Valeri and, as part of that same transaction, agreed to pay Valeri $75,000 if he could obtain certain zoning approvals for those properties. Such a reading is contrary to well established principles of contract interpretation. See, e.g., *Hirschfeld* v. *Machinist,* 181 Conn. App. 309, 323, 186 A.3d 771 ("contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so" (internal quotation marks omitted)), cert. denied, 329 Conn. 913, 186 A.3d 1170 (2018); *Meeker* v. *Mahon,* supra, 167 Conn. App. 634 (when agreements are connected by reference and subject matter, court must consider them together in determining parties' intent); *Morrissey-Manter* v. *Saint Francis Hospital & Medical Center,* 166 Conn.

App. 510, 521, 142 A.3d 363 ("[a] contractual promise cannot be created by plucking phrases out of context; there must be a meeting of the minds between the parties" (internal quotation marks omitted)), cert. denied, 323 Conn. 924, 149 A.3d 982 (2016).

Furthermore, Valeri's reliance on § 203 of the Restatement (Second) of Contracts in support of his argument that paragraph 16 of the contract for sale is boilerplate language that is superseded by the escrow agreement is misguided. To be sure, separately negotiated and more specific provisions will control over standardized and more general ones. See 2 Restatement (Second), supra, § 203 (c) and (d), p. 93. At the same time, however, subsection (a) of that provision provides that "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." Id., § 203 (a), p. 93. Thus, given that paragraph 16 of the contract for sale specifically requires that 12 Downs Street not be subject to easements, whereas the escrow agreement is silent on that issue, the only reasonable interpretation that gives effect to both provisions precludes a unilaterally imposed variance condition that requires an easement. See id., comment (a), p. 93 (noting that preferences for interpretation "apply only in choosing among *reasonable* interpretations" (emphasis added)).

Finally, Valeri relies on the fact that MSPD understood that the only access to the additional parking spaces behind 10 Downs Street was across 12 Downs Street to suggest that MSPD therefore knew that a permanent easement would be required for the use variance for 10 Downs Street. The problem with this reasoning is that "easement" is defined, in relevant part, as "[a]n interest in land *owned by another person* . . . ." (Emphasis added.) Black's Law Dictionary (11th Ed. 2019) p. 644. Therefore, because MSPD owned both properties, no easement would be required to allow such access. See, e.g., *Beneduci* v. *Valadares*, 73 Conn. App. 795, 808, 812 A.2d 41 (2002) ("[w]hen the plaintiff became the owner in fee of the servient estate, his easement was extinguished by merger"); 2 Restatement (Third), Property, Servitudes § 7.5, comment (a), p. 366 (2000) ("When the burdens and benefits are united in a single person, or group of persons, the servitude ceases to serve any function. Because no one else has an interest in enforcing the servitude, the servitude terminates."). Accordingly, the fact that there was no dispute about the location of the additional parking spaces does not have the probative force that Valeri suggests.

In sum, we conclude that the escrow agreement, when read together with the contract for sale, is unambiguous that the use variance Valeri obtained for 10 Downs Street, which was conditioned on the granting

of an easement over 12 Downs Street, could not satisfy paragraph 2b of the escrow agreement. Accordingly, the court properly awarded the escrow funds to MSPD.[6]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] For the sake of clarity, we refer to the parties by name.

[2] On August 21, 2020, the trial court, *Kowalski*, *J.*, granted Rader's motion for an interlocutory judgment of interpleader and ordered that his legal fees be paid and that the remaining balance of $73,398.80 be deposited with the court clerk. Rader was thereafter discharged from liability, and he is not participating in the present appeal.

[3] The trial court also concluded that MSPD failed to rebut the presumption that time was not of the essence as to the February 1, 2020 deadline. After Valeri filed the present appeal, MSPD filed a preliminary statement of the issues pursuant to Practice Book § 63-4 (a) (1), in which it indicated that it intended to raise the timeliness issue as an alternative ground for affirming the judgment in its favor. In his principal brief on appeal, Valeri argued that the court properly concluded that time was not of the essence under the parties' agreement. Because MSPD has abandoned that issue by failing to address it in its appellee's brief and because Valeri is not aggrieved by that part of the court's decision, we do not consider it.

[4] Although the trial court did not state whether the agreement was unambiguous, we note that it concluded that Valeri's authority was limited by the language of the parties' agreements, and it did not rely on any extrinsic evidence as to the parties' intent in reaching that conclusion.

[5] As previously noted in this opinion, paragraph 14 of the contract for sale provides: "Escrow agreement to be finalized by attorneys: contingent upon [Valeri] delivering [two-family] status for #10 Downs . . . by 1/31/20." Paragraph 34 of the rider to contract provides: "Supplementing paragraph 14, the sum of $75,000 shall be held in escrow until the zoning and use contingencies are satisfied. [Valeri] and [MSPD] shall execute a mutually agreeable form of escrow agreement at closing."

[6] We note that Valeri did not challenge the amount of attorney's fees awarded to MSPD and claimed only that the award must be reversed along with the court's award of the escrow funds.