******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

BETHEL BASEBALL ASSOCIATION, INC. *v.*
KURT R. DYER
(AC 46590)

Bright, C. J., and Clark and Westbrook, Js.*

*Syllabus*

The defendant appealed from the trial court's judgment for the plaintiff on its counts alleging conversion and statutory theft. He claimed, inter alia, that the court erred in concluding that he had committed conversion and statutory theft. *Held*:

The trial court did not err in finding that the defendant committed conversion and statutory theft, as ample evidence in the record, unchallenged by the defendant, supported the court's conclusion that the defendant engaged in the unauthorized withdrawal of the plaintiff's funds and that he intended to deprive the plaintiff of its property.

This court declined to review the defendant's unpreserved claim that the trial court abused its discretion by failing to address various discovery disputes arising from the plaintiff's alleged noncompliance with the defendant's discovery requests.

Argued October 17, 2024—officially released April 1, 2025

*Procedural History*

Action to recover damages for, inter alia, conversion, and for other relief, brought to the Superior Court in the judicial district of Danbury and tried to the court, *Shaban, J.*; judgment in part for the plaintiff, from which the defendant appealed to this court. *Affirmed.*

*Kurt R. Dyer*, self-represented, the appellant (defendant).

*Christopher G. Winans*, for the appellee (plaintiff).

*Opinion*

BRIGHT, C. J. The self-represented defendant, Kurt R. Dyer, appeals from the judgment, rendered after a court trial, in favor of the plaintiff, Bethel Baseball

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Association, Inc., on its counts alleging conversion and statutory theft. On appeal, the defendant claims that the court (1) erroneously concluded that he had committed conversion and statutory theft and (2) abused its discretion by not addressing the plaintiff's failures to properly respond to his discovery requests. We affirm the judgment of the trial court.

The following facts, as found by the trial court, and procedural history are relevant to our resolution of this appeal. The plaintiff is an incorporated Little League baseball organization for groups of children ages five to twelve and thirteen to fifteen years old. The plaintiff has an executive board consisting of a president, a vice president for each age group, a secretary, and a treasurer. The duties of the treasurer included filing tax returns, reconciling the bills and income of the organization, maintaining the books and records, and handling any necessary payments that needed to be made by signing checks or making payments through cash, credit, or debit. The treasurer also was responsible for giving treasurer's reports to the executive board, which specified the total amount deposited in and withdrawn from the accounts for each month and included detail as to the individual deposits and withdrawals for the month. To pay expenses, the plaintiff maintained both a checking account and a savings account. A debit card also was available to the treasurer to use pursuant to his duties.

Jay Waterman served as the plaintiff's treasurer for nearly twenty years until 2017, when he became ill and was unable to continue his duties. Justin Fern briefly served as interim treasurer until October, 2017. In October, 2017, as the defendant's term as president was expiring, the executive board voted to elect the defendant as treasurer. The defendant served as treasurer from November 1, 2017, until October 31, 2018. After his tenure, Linda Tran briefly served as treasurer until

Scott Beverly took over the position, starting in May, 2019. In early 2019, Beverly also became part of the finance committee, which was created to help the treasurer plan for the flow of income and expenses and to oversee the plaintiff's finances.

Upon assuming his duties, Beverly reviewed several bank statements from the period when the defendant served as treasurer and noticed several irregularities. Beverly observed that the statements showed a significant loss of funds, however, they did not show any significant individual expenditures that would have accounted for the irregularities he observed. Beverly compared the bank statements to the treasurer's reports and noticed significant variances between what had been reported by the defendant and what the bank statements actually showed. The defendant typically had reported that the plaintiff was running a positive balance. After examining the reports, Beverly noticed that "[o]ften the amount reported by the defendant in the monthly [treasurer's] reports as to what was in the [plaintiff's] accounts was more than what was eventually shown on the bank statements."

"After [the plaintiff] attempted to do an initial reconciliation of the defendant's treasurer's reports and the corresponding bank account statements, [the plaintiff found] a negative variance of $35,000. . . . After a more complete reconciliation covering the defendant's term as treasurer from November, 2017, through October, 2018, which showed cash withdrawals over each month, the negative variance grew to approximately $69,000. The balance in the savings account went from $66,000 down to $10,000 during this time." (Citations omitted.)

The record of purchases made with the plaintiff's debit card showed further discrepancies. Many of the

items purchased appeared to be unrelated to the plaintiff's ordinary expenses. Additionally, it appeared that several purchases were made with the debit card and returned for a cash refund. The records did not show any amount of cash being returned to the account. Of these debit card purchases, $2317.49 were for expenses unrelated to the plaintiff's ordinary expenses. The plaintiff's bank informed Beverly that the only individuals authorized to use the card between November, 2014, and November, 2018, were Waterman, who was ill and no longer able to perform his duties, and the defendant. Beverly notified the executive board of the irregularities, and the executive board then hired an accounting firm to review the plaintiff's financial statements and records. After the accounting firm's review, it was determined that many of the items purchased with the plaintiff's debit card were not related to the plaintiff's activities or purposes. A specific summary of the items purchased with the card and several receipts showed that these purchases totaled approximately $25,000. The accounting firm recommended that the plaintiff file a complaint with the Bethel Police Department, which it did.

"As part of its investigation, the police interviewed several individuals, including Craig Carlson, a former president and treasurer of the [plaintiff]. Carlson was unaware of the investigation until he was contacted by the police. The interest of the police in Carlson stemmed from an accusation by the defendant's attorney[1] that Carlson had often requested and received money from the defendant, ostensibly to pay the umpires, but that Carlson had used it for his own purposes. At no time during Carlson's tenure as president or treasurer . . . did the defendant ever accuse Carlson of misuse of [the

---

[1] During the police investigation, the defendant was represented by an attorney. The defendant was self-represented at trial and remains so on appeal.

plaintiff's] funds. It was not until the police began its investigation that the defendant's attorney leveled the accusation against him. Carlson met with the police three times and provided them with documents relevant to the investigation. No action was ever taken by the police against Carlson." (Footnote added.)

During the defendant's tenure as treasurer, Carlson and the defendant coordinated the payment of umpires. Umpires were typically paid in cash by a member of the plaintiff at each game. The treasurer was responsible for withdrawing the cash from the plaintiff's savings account at the bank. Carlson typically communicated requests for cash to the defendant by email or phone.

"Tom Martin, a former vice president of the [plaintiff], had expressed concerns to the defendant during the defendant's term as president and treasurer that Carlson's requests were sometimes out of line with what the schedule of games showed and therefore suggested that Carlson not be given any more money. However, Martin also acknowledged that any discrepancy from his perspective amounted to only approximately $190.10. At one point, in a text message between Martin and the defendant, they discussed whether or not they should ask Carlson to resign from the executive board. . . . Despite the concerns raised, neither Martin nor the defendant ever asked the executive board to consider seeking Carlson's resignation or to investigate him. . . . In his testimony . . . Martin acknowledged that, following the finance committee's completion of its look into the issue of the loss of funds, and the audit investigation having been done, he did not believe that Carlson had taken any funds for his own use." (Citations omitted; footnotes omitted.)

"In August and September of 2018, there was a series of text messages and emails between . . . Fern and the defendant. . . . In those messages, the defendant

indicated to Fern that [the plaintiff] was running low on cash. Fern responded that this was impossible as at the time he turned over the treasurer's duties, accounts, and records to the defendant, [the plaintiff] had approximately $75,000 in its accounts. . . . In response, the defendant provided Fern with his written explanation of the withdrawals. . . . The defendant believed that Carlson's requests for funds for the umpires was an issue. Fern had serious concerns about Carlson's requests for funds and thought that he should be removed from the executive board and that, if he remained, he would 'bankrupt the league.' Fern suggested to the defendant that an audit of the finances and requests be done, but the defendant did not want to do so. . . . Despite Fern's concerns about Carlson, he never brought any of those concerns to the attention of the executive board." (Citations omitted.)

"The audit turned over to the police department found that at one point there was a deficit of approximately $60,000 in the accounts of the [plaintiff] and it appeared to be due in part to cash withdrawals having been made from the account." The finance committee emailed the defendant a list of the cash withdrawals made during his tenure that remained unaccounted for and requested further information about them. "The defendant responded that the withdrawals were for the payment of the umpires. Although the defendant attempted to be cooperative in answering the questions posed, he did not provide any receipts or documentation for the period during which he acted as treasurer."

The finance committee reviewed the records of umpire payments requested compared to the withdrawals from the plaintiff's accounts and found that, of the fifty-six cash withdrawals made, only five matched the amount requested. Moreover, it was determined that the amount of money identified as being withdrawn to pay the umpires by the defendant was far more than historically

had occurred. Based on the number of games played and the umpires required, "it would have been mathematically impossible to pay out the amount of cash that was reportedly withdrawn for that purpose. Although the defendant claimed that he only withdrew the amount requested by Carlson, there was no notation in any treasurer reports of such requests." Further, "Carlson's requests for funds for the umpires in 2017 and 2018 were approximately $30,000 each year, which [were] consistent with cash requests from prior years."

In the years after the defendant's term as treasurer, 2019 through 2021, the income and expenses of the plaintiff returned to the levels they had been prior to his tenure.

"Upon completion of its investigation, the police arrested the defendant. He was charged with larceny in the first degree and conspiracy to commit larceny in the first degree. As to the charges, the defendant filed an application for accelerated rehabilitation which was granted by the court. As part of the condition of participation in the program, the defendant was required to, and did, make payment of $25,313 to the [plaintiff]." (Citations omitted.) This amount addressed the questionable purchases made by the defendant with the plaintiff's debit card but did not address the approximately $60,000 in questionable cash withdrawals made by the defendant.

The plaintiff commenced the underlying action on November 12, 2020. In its amended complaint, filed on April 7, 2021, the plaintiff asserted claims of conversion and statutory theft in violation of General Statutes § 52-564,[2] predicated on the allegation that the defendant withdrew thousands of dollars from the plaintiff's

---

[2] General Statutes § 52-564 provides: "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."

accounts for his own personal uses.[3] On May 21, 2021, the defendant filed an answer in which he admitted to serving as president and then treasurer during the relevant periods but denied or left the plaintiff to its proof as to the remaining factual allegations.

The matter was tried to the court, *Shaban, J.*, on February 23 and 24, 2023. At trial, the court heard testimony from Beverly, Fern, Martin, and Carlson and admitted several exhibits into evidence. The defendant elected not to testify pursuant to his right under the fifth amendment to the United States constitution.

On May 23, 2023, the court rendered judgment for the plaintiff on the counts alleging statutory theft and conversion; see footnote 3 of this opinion; concluding that the plaintiff had proven by a preponderance of the evidence that the defendant converted the plaintiff's funds to his own use and thereby committed statutory theft. In its memorandum of decision, the court stated that, "[b]ased on the cumulative testimony and the properly admitted exhibits, there is sufficient direct and circumstantial evidence, coupled with the adverse inference from the defendant's election not to testify on his own behalf, to find that the plaintiff has met its burden of establishing by a preponderance of the evidence that the defendant converted the [plaintiff's] funds to his own use. . . . Also, although there is more circumstantial than direct evidence of conversion and theft, the credible testimony of the witnesses and the admitted exhibits are of sufficient weight to establish . . . that the defendant engaged in the unauthorized withdrawal of the plaintiff's funds and, therefore, committed an

---

[3] The plaintiff also alleged in a separate count that the defendant breached his fiduciary duty to the plaintiff by misappropriating the funds. The court rendered judgment for the defendant on that count, concluding that the plaintiff failed to establish that the defendant owed it a fiduciary duty while acting as treasurer, and the plaintiff did not file a cross appeal to challenge the court's judgment.

intentional deprivation of property." (Citations omitted.) The court found that the plaintiff had suffered compensatory damages of $69,040 as a result of the defendant's conversion and theft. The court, pursuant to § 52-564, then trebled those damages and rendered judgment for the plaintiff in the amount of $207,120. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

On appeal, the defendant claims that the court erroneously concluded that the defendant had committed conversion and statutory theft.[4] According to the defendant, "[t]he trial court's memorandum of decision is riddled with significant factual errors, each one a glaring contradiction to the evidence cited within those pages. The cumulative effect of these inaccuracies cannot be overstated. . . . Given that every one of these inaccuracies favor the plaintiff, [the defendant] asserts that undoubtedly these errors unfairly influenced the court's conclusions, ultimately resulting in a clearly erroneous determination." (Emphasis omitted.) In essence, the defendant claims that the court's erroneous findings of

---

[4] The defendant also requests that this court take judicial notice of the plaintiff's 2018 federal tax return, which he claims demonstrates that the plaintiff "did not experience an unexplained increase in expenses but rather a deficit due to a decrease in [its] revenue" and, therefore, conversion did not occur. (Emphasis omitted.) We decline to take judicial notice of the 2018 federal tax return because "the trial court, rather than an appellate court, finds facts." *State* v. *Edwards*, 314 Conn. 465, 480, 102 A.3d 52 (2014). The tax return was not offered as evidence at trial and therefore is not a part of the record in the present case. Moreover, while this appeal was pending, the defendant filed a motion to open the judgment in the trial court asserting that the tax return was newly discovered evidence that disproved the plaintiff's allegations that money had been misappropriated. The trial court denied the motion after a hearing, and the defendant has not challenged that ruling either by amending this appeal pursuant to Practice Book § 61-9 or by filing a new appeal. Accordingly, we will not consider the 2018 federal tax return. See id., 478 ("we cannot consider evidence not available to the trial court to find adjudicative facts for the first time on appeal").

facts led it to incorrectly conclude that he engaged in conversion and statutory theft. For its part, the plaintiff contends that the trial court's findings of fact were supported by the evidence, and, to the extent the court erred in any of its subsidiary findings, the court's ultimate conclusions were adequately supported by the evidence presented. We agree with the plaintiff.

We begin by setting forth the applicable standard of review and relevant legal principles. "It is well established that [a]ppellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . [W]here . . . some of the facts found [by the trial court] are clearly erroneous and others are supported by the evidence, we must examine the clearly erroneous findings to see whether they were harmless, not only in isolation, but also taken as a whole. . . . If, when taken as a whole, they undermine appellate confidence in the court's [fact-finding] process, a new hearing is required. . . . In a civil case, [t]he harmless error standard . . . is whether the improper ruling would likely affect the result." (Citations omitted; internal quotation marks omitted.) *Rader* v. *Valeri*, 223 Conn. App. 243, 260, 308 A.3d 66, cert. denied, 348 Conn. 959, 312 A.3d 37 (2024).

"The tort of [c]onversion occurs when one, without authorization, assumes and exercises ownership over property belonging to another, to the exclusion of the owner's rights. . . . Thus, [c]onversion is some unauthorized act which deprives another of his property permanently or for an indefinite time; some unauthorized assumption and exercise of the powers of the owner to his harm. The essence of the wrong is that

the property rights of the plaintiff have been dealt with in a manner adverse to him, inconsistent with his right of dominion and to his harm. . . . Conversion can be distinguished from statutory theft as established by [General Statutes] § 53a-119 in two ways. First, statutory theft requires an intent to deprive another of his property; second, conversion requires the owner to be harmed by a defendant's conduct. Therefore, statutory theft requires a plaintiff to prove the additional element of intent over and above what he or she must demonstrate to prove conversion." (Internal quotation marks omitted.) *AAA Advantage Carting & Demolition Services, LLC* v. *Capone*, 221 Conn. App. 256, 289, 301 A.3d 1111, cert. denied, 348 Conn. 924, 304 A.3d 442 (2023), and cert. denied, 348 Conn. 924, 304 A.3d 442 (2023).

In its memorandum of decision, the court found that these elements had been satisfied. Specifically, the court found that "[t]he evidence is sufficient to establish that the defendant, without authorization, assumed and exercised ownership over funds belonging to the [plaintiff] to its exclusion. . . . There is little question that the [plaintiff] was harmed as a result of the defendant's unauthorized acts. . . . The court finds that the defendant intended to exercise dominion and control over those funds. . . . [T]he credible testimony of the witnesses and the admitted exhibits are of sufficient weight to establish by a preponderance of the evidence that the defendant engaged in the unauthorized withdrawal of the plaintiff's funds and, therefore, committed an intentional deprivation of property." (Citations omitted.)

The court "[found] particularly credible the testimony of Beverly regarding the audit, its results, the limited access of others to [the plaintiff's] accounts during the defendant's tenure as treasurer, the consistent history of income and expenses of the [plaintiff] except for the period of time [that the] defendant was treasurer, as

well as Beverly's own work along with that of the finance committee in investigating the precipitous drop in income without any other identifiable variable accounting for such a drop. That testimony was supported by the credible testimony of both Fern and Martin." The court also considered the involvement of Carlson and concluded that, based on the testimony of Fern, Martin, and Carlson himself, "[t]here was little to indicate that Carlson's involvement would have led to such a large loss during the period of time in question. . . . Consistent with this conclusion is the police department's taking no action against Carlson and its arrest of the defendant." The court also noted that, although "the granting of his accelerated rehabilitation application relative to the larceny charges is not any sort of admission of guilt . . . the $25,313 payment to the [plaintiff] as a condition of the defendant's participation in that program can be considered as an informal acknowledgment of the defendant's responsibility from a civil perspective."

In support of its findings, the court had before it the following relevant testimony and documentary evidence. Beverly testified as to the finance committee's investigation into the plaintiff's loss of funds. He testified that the finance committee reviewed the plaintiff's savings and checking account statements, admitted into evidence as exhibits 11 through 25 and 30, and observed a significant decrease in funds over the course of the defendant's tenure as treasurer. He testified that the finance committee compared the bank statements with the treasurer's reports, which were admitted into evidence as exhibit 4. Beverly testified that the figures reported by the defendant in the treasurer's reports did not align with the corresponding bank statements, and, in fact, the treasurer's reports often indicated that there was more money in the plaintiff's accounts than reflected by the bank statements. Beverly testified that

the finance committee's review of the treasurer's reports and the plaintiff's bank statements revealed an "unexplained hole of cash of over [$60,000]." The finance committee created a summary of the increases and decreases of the plaintiff's checking and savings accounts compared to the amount represented on the treasurer's reports. This summary, admitted into evidence as exhibit 9, provided for a variance of $34,718 from the treasurer's reports and a total loss of $58,099 from the plaintiff's accounts between September, 2017, and February, 2019. Beverly testified that the finance committee concluded that the decrease in funds was primarily attributed to numerous cash withdrawals from the accounts. During his testimony, Beverly referenced exhibit 7, which included emails from Carlson to the defendant requesting funds for umpire payments and a summary of the finance committee's attempt to match the requests for payments to the withdrawals. Beverly further testified that, of the fifty-six withdrawals from the plaintiff's accounts, only five withdrawals matched the amount requested by Carlson, with the other fifty-one withdrawals exceeding the amount requested. Beverly also testified that, on February 2, 2019, the finance committee sent their summary of unaccounted for cash withdrawals, admitted into evidence as exhibit 31, to the defendant for additional information on the withdrawals. The explanations the defendant provided, admitted into evidence as exhibit 32, primarily attributed the withdrawals to umpire fees. Beverly testified that the amount of money classified as umpire payments was far higher than what the plaintiff historically had spent. Exhibit 33 includes, inter alia, a summary of Carlson's requests to the defendant for umpire payments during the fall of 2017 and spring of 2018. In the fall of 2017, Carlson requested $5435 for umpire payments. In the spring of 2018, he requested $31,420. Additionally, an estimate of umpire fees for the 2018

year, admitted into evidence as exhibit 34, projected a total of $26,225 in umpire payments. Beverly testified that both the records of umpire payments as well as the estimate demonstrated that the amount withdrawn was significantly higher than the amount the plaintiff would expect to spend on umpires in any particular season. On the basis of the finance committee's work investigating the loss of funds, Beverly testified that the unaccounted for cash withdrawals totaled $69,000. This testimony is supported by exhibit 10, a summary of "Missing [Plaintiff] Cash," which provides $69,040 as the total amount of money the plaintiff lost.[5]

Beverly further testified that there were numerous transactions made at stores with the plaintiff's debit card, either for goods unrelated to the association or goods purchased and then returned for cash, with no corresponding deposit in the plaintiff's accounts. During his testimony, Beverly referenced exhibit 5, a summary of bank statements documenting the questionable transactions; exhibits 36, 37, and 38, receipts obtained by the Bethel Police Department; and exhibit 35, a summary of the transactions on the debit card, reflecting a total $25,205.52 in purchases that were fraudulent or returned for unaccounted for cash. Beverly further testified that the defendant's restitution payment to the plaintiff as part of his accelerated rehabilitation application in the criminal case represented the funds lost due to the defendant's misuse of the plaintiff's debit card.

Beverly testified that there was limited access to the plaintiff's accounts during the relevant period. Exhibit

---

[5] Exhibit 10 provides a calculation of the total missing cash. The summary provides for $87,683 as total cash withdrawals between October, 2017, and November, 2018. It also includes $1288 as accounting firm fees and $8000 as "C. Winan Fees," presumably referring to the plaintiff's counsel, both incurred in "2019/2020." The summary also includes $27,930 as "normal cash spend." The defendant does not raise any challenge as to the court's findings relating to the amount of funds withdrawn from the plaintiff's accounts or the damages awarded to the plaintiff by the court.

6, a correspondence between the financial committee and the plaintiff's bank, established that, during the relevant period, the only people with authorized access to the plaintiff's banks accounts were Waterman, who was incapacitated,[6] and the defendant. The correspondence with the bank further showed that the defendant was the only person issued a debit card during that time. Although the defendant attempted to establish at trial that Carlson was responsible for the loss of funds, Beverly, Fern, and Carlson all testified that Carlson did not have any access to the plaintiff's accounts or funds beyond receiving cash from the defendant to pay the umpires during the relevant period.

Notwithstanding all of this evidence, the defendant claims that the court made various subsidiary findings of fact that were clearly erroneous, undermining its ultimate conclusion that the defendant's liability had been established by a preponderance of the evidence. We address each in turn.

First, the defendant argues that the court's finding that "often the amount reported by the defendant in the monthly [treasurer's] reports as to what was in the [plaintiff's] accounts was more than what was eventually shown on the bank statements" is clearly erroneous as "[t]he plaintiff did not present any evidence to support this claim . . . [and] [the defendant] never reported balances, and it was not in the [plaintiff's] practice to do so." He argues that "these instances represent substantial errors in the court's factual findings, which inaccurately depict [the defendant] as intentionally disseminating misleading information to the plaintiff regarding the [plaintiff's] financial state." The problem with the defendant's argument is that the court's

---

[6] The trial court found that, "by 2017, Waterman had become ill and no longer was able to perform his duties, leaving the defendant as the sole individual with access to the card." The defendant does not challenge this finding.

finding did not refer to account balances. Instead, the court referred to the monthly cash flow reported by the defendant in the treasurer's reports. The evidence indicated that the reports submitted by the defendant set forth the amounts deposited to and withdrawn from the accounts for each month and that those figures did not align with the corresponding bank statements for the plaintiff's accounts. Consequently, we cannot conclude that the court's finding is clearly erroneous.

Second, the defendant argues that the court's finding that "the audit turned over to the police department found that, at one point, there was a deficit of approximately $60,000 in the accounts of the [plaintiff] and it appeared to be due in part to cash withdrawals having been made from the account" was clearly erroneous. He argues that it is significant that exhibit 46, on which the court relied, "is not an 'audit' . . . and more importantly, it does not mention a 'deficit of approximately $60,000' *or any sum close to that amount* . . . ." (Citation omitted; emphasis in original.) Although the defendant is correct that exhibit 46 is a compilation rather than an audit,[7] and does not reference a shortfall of $60,000, the court had ample other evidence that proved the amount of the plaintiff's loss. Specifically, Beverly, whom the court found to be a credible witness, testified

---

[7] "Broadly speaking, auditors can provide three different types of accounting services: compilations, reviews, and audits. A compilation is the lowest level of assurance regarding an entity's financial statements. . . . It expresses neither an opinion nor any level of assurance. . . . When performing a compilation, an accountant need not verify or corroborate the financial statement information provided by the client. . . . In an audit, which provides the highest level of assurance on financial statements, the accountant provides verification of the financial statements' claims and assertions and expresses an opinion on the entity's financials." (Citations omitted; internal quotation marks omitted.) *Otto* v. *Pennsylvania State Education Assn.-NEA*, 330 F.3d 125, 133 (3d Cir.), cert. denied sub nom. *Shaler Area Education Assn.* v. *Emory*, 540 U.S. 982, 124 S. Ct. 466, 157 L. Ed. 2d 372 (2003), and cert. denied, 540 U.S. 982, 124 S. Ct. 467, 157 L. Ed. 2d 372 (2003).

that the finance committee's review of the treasurer's reports and the plaintiff's bank statements revealed an "unexplained hole of cash of over [$60,000]." In addition, exhibit 10 reflects a total of $87,683 in cash withdrawals from October, 2017, through November, 2018. The summary refers to $27,930 as "normal cash spend" during that period. Exhibit 7, which summarizes check requests and cash withdrawals from the plaintiff's savings and checking accounts, states that a total of $57,888 was "[o]ver withdrawn" between September, 2017, and October, 2018. Further, exhibit 9, which summarizes the increases and decreases of the plaintiff's checking and savings accounts, represents a total loss of $58,099 from the plaintiff's accounts between September, 2017, and February, 2019. Thus, although exhibit 46 does not support the specific finding challenged by the defendant, the record contains an abundance of other evidence establishing that approximately $60,000 remained unaccounted for after the finance committee reviewed the plaintiff's accounts.[8]

Third, the defendant argues that the court's finding that, after the plaintiff asked for information about what the cash withdrawals were for, "[t]he defendant responded that they were for the payment of umpires" is clearly erroneous. The defendant argues that the court referenced exhibit 32 in relation to this finding, which demonstrates that several of the payments were indicated by the defendant to have been for expenses other than umpires, and "[n]owhere is it evidenced that [the defendant] indicated that all of these withdrawals were for umpires, as this statement implies." We see no such implication in the court's finding. The evidence at trial

---

[8] Although the defendant challenges the accuracy of the court's description of the audit report, we again note that he does not raise any challenge as to the court's findings relating to the amount of funds withdrawn from the plaintiff's accounts or the damages awarded to the plaintiff by the court. See footnote 5 of this opinion.

was clear that the defendant's principal focus when explaining the discrepancies revolved around the payment of umpires. Exhibit 32 reflects that the defendant claimed that the primary justification for cash expenses was the payment of umpires. Similarly, the court heard testimony that the payment of umpires was the defendant's regular explanation when he was questioned about cash expenditures. For example, when describing the defendant's explanations for the withdrawals, Beverly testified that "[m]ost of them, primarily, being umpire spent." Similarly, when asked at trial if he knew what misappropriated funds were at issue, Carlson replied, "It was brought to my attention that they're talking about umpire funds that were put on the spreadsheet that [they] said were not used for umpires." Consequently, the defendant's argument is without merit.

Fourth, the defendant argues that the court's finding that, "although the defendant attempted to be cooperative in answering the questions posed, he did not provide any receipts or documentation for the period during which he acted as treasurer" is clearly erroneous because it is contradicted by exhibit C, which the court cited to in support of that finding. We disagree with the defendant's interpretation of the court's finding. Specifically, the challenged finding refers to questions posed by the plaintiff to the defendant regarding the basis for certain cash withdrawals, which the defendant claimed "were for the payment of the umpires." Exhibit C is comprised of several email exchanges from 2018 and 2019 between the defendant, Martin, Carlson, and Fern, some of which are exchanges between the defendant and Carlson, discussing umpire payments in 2018 during the defendant's tenure as treasurer. Exhibit C also includes emails in which the defendant forwarded several of his email exchanges with Carlson to Martin on March 2, 2019.[9] Exhibit C does not, however, include

---

[9] We note that, although during trial the defendant refers to exhibit C as additionally containing text messages, the exhibit itself contains emails only.

any receipts or other documentation to substantiate that the amount withdrawn matched the amount requested for umpire payments.

It is clear from a reading of the memorandum of decision that the court did not view the email exchanges in exhibit C as constituting "receipts or documentation." In particular, the court found that, "[a]lthough the defendant claimed that he withdrew only what he was asked for by Carlson, there was no notation in any treasurer reports of such requests." Moreover, the challenged finding is supported by Beverly's testimony. On cross-examination of Beverly, the defendant attempted to establish his own cooperation in the finance committee's investigation by asking Beverly whether he provided information as requested, to which Beverly replied, "You didn't provide any receipts or documentation for the time period in question. That's why we're here."

Fifth, the defendant argues that the court's finding that the defendant provided "written explanations of the withdrawals" to Fern is clearly erroneous as there is no evidence in the record to support it. The defendant relatedly argues that exhibit 11, referenced by the court, does not support this finding. The defendant overlooks that the evidence in the record supports that the defendant, in exhibit 32, provided written explanations of the cash withdrawals to the finance committee at its request. Consequently, even if the court erred in referring to Fern instead of the finance committee and mistakenly referred to exhibit 11 instead of exhibit 32, such errors were harmless. See *Rader* v. *Valeri*, supra, 223 Conn. App. 261.

Sixth, the defendant argues that the court's finding that "Fern suggested to the defendant that an audit of the finances and requests be done, but the defendant did not want to do so" is clearly erroneous, as this fact

is not supported by exhibit C, referenced by the court in relation to this finding, and, moreover, exhibit D demonstrates that the defendant was advocating for the audit, not opposing it. We are not persuaded.

Exhibit D[10] is a series of emails between the defendant, Martin, and Fern. In an email from Fern to both the defendant and Martin on September 21, 2018, Fern detailed his view of Carlson's ability as a board member and his management of funds. In the email, Fern stated, "And now [Carlson] knows [Martin is] double checking him which is probably why he went bananas when [the defendant] told him that he wanted an audit." Were this the only evidence before the court, the defendant's argument might have merit. The court heard conflicting evidence, however, as to whom, between Fern and the defendant, wanted an audit. At trial, Fern directly refuted the statements contained in exhibit D in the following exchange between himself and the defendant, who, on direct examination, asked Fern to read portions of the email exchange aloud.

"[Fern]: . . . which is probably why he went bananas when [the defendant] told him that he wanted an audit."

"[The Defendant]: I'm sorry. Who wanted the audit?

"[Fern]: I wanted the audit, but I told you to tell him.

"[The Defendant]: Can you please read the email?

"[Fern]: This says when [the defendant] told him that he wanted an audit, but—

---

[10] Although exhibit D does not appear on the electronic exhibit list on the Judicial Branch website, the court's list of exhibits indicates that it was admitted as a full exhibit. The trial court transcript similarly reflects that the defendant offered exhibit D into evidence and that the court admitted it as a full exhibit. We also note that, although the trial court, in its memorandum of decision, refers to exhibits "D-1" and "D-2," exhibit D consists of one singular exhibit.

"[The Defendant]: So, this clearly states that [the defendant] wanted an audit.

"[Fern]: [The defendant] did not want an audit. [The defendant] did not want an audit.

\* \* \*

"[The Defendant]: Is that not written in the email that you—

"[Fern]: It is, but I was the one—

"[The Defendant]: Okay. Thank you.

"[Fern]: —that wanted the audit.

\* \* \*

"[Fern]: Well, I thought the first option was for me to look at the statements, which you didn't want me to do. . . . [T]he second option was to get an audit, which you didn't want to do.

\* \* \*

"[The Defendant]: Who didn't want that?

"[Fern]: You.

"[The Defendant]: I didn't want—okay. . . . [A]nd how did we have communication?

"[Fern]: Directly.

"[The Defendant]: Face-to-face?

"[Fern]: Yep."

On cross-examination by the plaintiff's counsel, Fern further stated that he, not the defendant, wanted the audit.

"[The Plaintiff's Counsel]: I think you said you suggested to [the defendant] that there be an audit.

"[Fern]: Oh. Absolutely, yeah.

"[The Plaintiff's Counsel]: And he wasn't interested in that.

"[Fern]: Was not interested in that."

The court, as the trier of fact, was free to weigh the evidence as it deemed appropriate. *Palkimas* v. *Fernandez*, 159 Conn. App. 129, 133, 122 A.3d 704 (2015) ("it is the exclusive province of the trier of fact to weigh the conflicting evidence, determine the credibility of witnesses and determine whether to accept some, all or none of a witness' testimony" (emphasis omitted; internal quotation marks omitted)). The court was not required to accept the defendant's interpretation of exhibit D over Fern's testimony, which the court found to be credible. Because it was supported by Fern's testimony, the court's finding that Fern suggested an audit, which the defendant did not want, was not clearly erroneous.[11]

In sum, we conclude that the specific factual findings challenged by the defendant either were not clear error or that any error was harmless. We therefore reject the defendant's claim that "these errors unfairly influenced the court's conclusions, ultimately resulting in a clearly erroneous determination." (Emphasis omitted.) As discussed previously, there was ample evidence in the

---

[11] The defendant also challenges several of the court's findings based on the treasurer's reports and a corresponding summary, which were admitted into evidence as exhibits 4 and 9, respectively. Exhibit 4 contains eight treasurer's reports submitted by the defendant to the plaintiff in 2018. The defendant argues that exhibits 4 and 9 omitted two reports for June, 2018, and October, 2018, in which the defendant reported a negative balance. In support of that contention, the defendant relies on his proposed exhibit F, which was not admitted into evidence at trial. Although the defendant included exhibit F on his list of proposed exhibits before the trial court, the transcript reveals that exhibit F neither was offered by the defendant nor admitted into evidence by the court at trial. Accordingly, we decline to review these claims. See *In re Jah'za G.*, 141 Conn. App. 15, 27 n.8, 60 A.3d 392 (declining to review claim predicated on evidence not in record), cert. denied, 308 Conn. 926, 64 A.3d 329 (2013).

record, unchallenged by the defendant, supporting the trial court's ultimate conclusion that the defendant engaged in the unauthorized withdrawal of the plaintiff's funds and that he intended to deprive the plaintiff of its property. Accordingly, we conclude that the trial court did not err when it found that the defendant committed conversion and statutory theft.

## II

The defendant next claims that the trial court abused its discretion by failing to address various discovery disputes arising from the plaintiff's alleged noncompliance with the defendant's discovery requests. The plaintiff argues that this claim is not reviewable because the defendant did not properly raise it before the trial court. We agree with the plaintiff.

The following additional procedural history is relevant to this claim. On August 1, 2022, the defendant filed a motion to compel the plaintiff to respond to eleven requests for production that he had propounded on July 26, 2022. On August 5, 2022, the plaintiff opposed the motion as premature under Practice Book § 13-10.[12] On August 30, 2022, the plaintiff filed objections to three of the defendant's requests for production. Specifically, the plaintiff objected to the defendant's requests for production of (1) the minutes of the plaintiff's meetings between 2014 and 2019, (2) contact information for umpires hired in 2017 and 2018, and records related to umpire fees, and (3) all records relating to any transactions by the defendant from the plaintiff's accounts between 2014 and 2019. On October 31, 2022, the defendant filed a motion for an order of compliance seeking to compel the plaintiff to produce responsive documents. The defendant claimed that the plaintiff had

---

[12] Practice Book § 13-10 provides in relevant part: "(a) The party to whom the request is directed or such party's attorney shall serve a written response, which may be in electronic format, within sixty days after the date of certification of service . . . ."

not only failed to produce documents as to which an objection had been made but had failed to produce any responsive documents for requests as to which there were no objections. The defendant asked the court to compel "immediate compliance as the trial is less than five weeks away." In response, the plaintiff filed a notice of compliance on November 4, 2022, stating that, pursuant to Practice Book § 13-10, it had complied with the defendant's request for production dated July 26, 2022. On November 4, 2022, the defendant filed a caseflow request seeking a hearing on his motion for an order of compliance. The plaintiff filed an objection to this request on November 7, 2022. The trial court, *Shaban, J.*, denied the request on the ground that the plaintiff had filed a notice of compliance with the defendant's requests. On November 9, 2022, the defendant filed an objection to the plaintiff's notice of compliance and responses to the defendant's requests for production in which he asserted that the plaintiff's responses were inadequate in several respects as well as a caseflow request seeking consideration of his objection to the plaintiff's notice of compliance. On November 18, 2022, the defendant filed a memorandum in support of his objection to the plaintiff's notice of compliance. On November 22, 2022, the court issued an order stating that "[a]ny issue regarding compliance with discovery will be addressed at the commencement of trial on November 30, 2022."

Thereafter, both parties requested and were granted continuances of the trial. In the defendant's motion for continuance, he explained, "I am respectfully requesting a continuance as I have just received nearly 200 pages of evidence from the plaintiff. Late Monday, [November 21, 2022], I received several emails from [the plaintiff's counsel] with large files attached to each email totaling nearly 200 pages of evidence from the plaintiff. This discovery was sent in response to my request from [July]. I need to gain access to the law library, which has been closed since early last week due to Thanksgiving."

Thereafter, the court granted the defendant's motion and rescheduled the trial to begin on February 23, 2023.

Following his motion for a continuance, the defendant did not file any further motions seeking an order for compliance by the plaintiff with his requests for production prior to trial. On February 15, 2023, the court ordered each party to submit a trial management report identifying proposed exhibits they intended to offer into evidence and witnesses they intended to call. In his trial management report, the defendant contended that "[the plaintiff] has possession and control of [the defendant's] relinquished records and receipts, evidence necessary to disprove [the plaintiff's] allegations, yet [the plaintiff] now denies the existence of such records and therefore would not release them to [the defendant] in discovery. [The plaintiff] is alleging [that the defendant] misused its funds and has the very records needed to prove otherwise as a result of the [defendant] voluntarily turning them over to the organization upon his departure at the end of his term. Yet [the plaintiff] now denies possession of said documents despite the fact that the defendant can document that these items were turned over to the plaintiff. . . . The plaintiff now controls this very evidence needed to document the purpose for the alleged 'unexplained, unnecessary and unusual' withdrawals. [The defendant] is prepared to present evidence to the contrary and will document that he did share this information with the plaintiff upon his voluntary departure from the organization."

On February 23, 2023, prior to the commencement of trial, the defendant did not raise any discovery issues with the court; rather, when asked by the court, "[A]re you ready to proceed today?" the defendant responded, "Yes, I am." At trial, during his cross-examination of the plaintiff's rebuttal witness, Beverly, the defendant contended that the plaintiff had removed its meeting

minutes from its website and had failed to produce them to the defendant. The following exchange took place:

"[The Defendant]: . . . why would it be necessary to pull the minutes down for past years going back— because folks that were there in 2015 and [2016] were not subject to scrutiny by the media, so why would you feel the need to pull them down?

"[Beverly]: We changed a lot of procedures when you left, first off. Right? There's a lot of things that happened that shouldn't happen. So, all of those are available to all of our board members, and whoever requests them, we are happy to provide minutes. We provided minutes to you in discovery as well.

"[The Defendant]: Was I provided 2015 and 2016 minutes?

"[Beverly]: For the associated part of this case—

"[The Defendant]: Yes.

"[Beverly]: —which is 2017 and 2018?

"[The Defendant]: Was I—

"[The Plaintiff's Counsel]: They were objected to, Your Honor, [on] relevance grounds.

"The Court: That's all right. Just go ahead and answer the question as best you can, Mr. Beverly.

"[Beverly]: No.

"[The Defendant]: I was not. Was there a particular reason for that?

"[Beverly]: No.

\* \* \*

"[The Defendant]: Why would minutes be down now, three years after the [arrest in 2020]?

"[The Plaintiff's Counsel]: . . . objection, relevance, Your Honor.

"[The Defendant]: No, [it] speaks to the transparency of the organization.

"The Court: Hold on. Hold on. So, the issue . . . is relevancy. I'm not sure what the relevancy is after—well after the fact . . . but I'm still going to allow the question. And again, what weight I give it is another issue."

In his closing argument before the trial court, the defendant, referencing financial documents he possessed when he was treasurer, stated, "I had turned everything over that I had. And now we're in a position to where much of those items have disappeared. Yet there was enough information to substantiate, to bring a case against me, but when asked in discovery for those items, I was told that they don't exist. And these are items such as receipts. These are all things that were provided to the [plaintiff]. I have to question the intent of the [plaintiff] when it looks like . . . transparency is not a primary focus anymore."

On appeal, the defendant argues that the minutes and missing financial records that he referenced during trial were the subject of his discovery requests to the plaintiff and that the court's failure to order the plaintiff to comply with the discovery requests prejudiced his ability to present his defense. Because the defendant did not properly preserve this claim in the trial court, we do not reach it.

"Our rules of practice provide that we are not bound to consider a claim unless it was distinctly raised at trial or arose subsequent to the trial. . . . A claim is distinctly raised if it is so stated as to bring to the attention of the court the precise matter on which its decision is being asked. . . . A claim briefly suggested

is not distinctly raised. . . . Our rules of procedure [also] do not allow a [party] to pursue one course of action at trial and later, on appeal, argue that a path he rejected should now be open to him. . . . To rule otherwise would permit trial by ambuscade." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *A & R Enterprises, LLC* v. *Sentinel Ins. Co., Ltd.*, 202 Conn. App. 224, 229, 244 A.3d 660, cert. denied, 336 Conn. 921, 246 A.3d 2 (2021).

In the present case, the record clearly establishes that the defendant did not raise the issue of the plaintiff's alleged discovery noncompliance to the trial court following his motion for a continuance of trial on November 22, 2022, in which he indicated to the court that the plaintiff *had* responded to his July 26, 2022 request for production. Given that the defendant's previous motion for compliance and objection to the plaintiff's notice of compliance both concerned the defendant's July 26, 2022 request for production, the plaintiff's production on November 21, 2022, seemingly resolved any remaining compliance issues without any need for involvement by the court. Significantly, at the commencement of trial, when asked by the court if he was ready to proceed, the defendant responded affirmatively, without raising any discovery issues.

The few references the defendant made in his trial management report and during trial to the plaintiff's failure to provide him with relevant documents cannot be construed as having distinctly raised a claim that the plaintiff had failed to comply with its discovery obligations and that this alleged failure prejudiced the defendant. In his trial management report, although the defendant contended that the plaintiff "denie[d] the existence" of "records and receipts" that he had turned over to the plaintiff, presumably when he ended his term as treasurer, the defendant did not specify the records to which he was referring, identify a request

for production to which the plaintiff had failed to respond, or request any action by the trial court. Other than his assertion that he "can document that these [records] were turned over to the plaintiff," nothing in the defendant's trial management report alerted the trial court that he was requesting any relief before the trial began. See *A & R Enterprises, LLC* v. *Sentinel Ins. Co., Ltd.*, supra, 202 Conn. App. 229.

Further, although the defendant contends that he "addressed the issue of the relevant records he had requested but was inexplicably denied during the discovery process in his examination of the witnesses," the defendant characterized the purpose of his questioning during trial as "speak[ing] to the transparency of the organization." Similarly, in his closing argument, the defendant again mentioned the alleged discovery noncompliance and stated, "I have to question the intent of the [plaintiff] when it looks like . . . transparency is not a primary focus anymore." The defendant, thus, used the plaintiff's lack of transparency as a reason for the court not to credit the plaintiff's evidence. Certainly, the defendant's few questions to witnesses regarding the plaintiff's failure to produce documents did not distinctly raise a claim that the plaintiff had violated its discovery obligations and should either be sanctioned or ordered to produce additional documents so that the defendant could properly present his case. Consequently, because the defendant raises this distinct claim for the first time on appeal, it was not properly preserved for this court to consider.[13] Accordingly, we decline to address this claim.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[13] The defendant argues, for the first time in his reply brief, that his claim is reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Specifically, the defendant claims that the trial court's failure to

address various discovery disputes infringed on his right to due process and to a fair trial. Other than a bald assertion that "the right to discovery is protected under the due process clause of the fourteenth amendment to the United States constitution," the defendant has provided no analysis as to why this garden variety discovery dispute is of constitutional magnitude or how the court deprived him of due process when he never alerted the court to the fact that he had not received the discovery he sought. See *Deutsche Bank National Trust Co.* v. *Pollard*, 182 Conn. App. 483, 487, 189 A.3d 1232 (2018) ("[a]lthough we recognize and adhere to the well-founded policy to accord leeway to self-represented parties in the appeal process, our deference is not unlimited; nor is a litigant on appeal relieved of the obligation to sufficiently articulate a claim so that it is recognizable to a reviewing court"). His claim, therefore, is inadequately briefed and, accordingly, we decline to review his claim. "We will not engage in *Golding* . . . review on the basis of . . . an inadequate brief." (Internal quotation marks omitted.) *State* v. *Abramovich*, 229 Conn. App. 213, 219, 326 A.3d 593 (2024).